# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ADRIEN PETERSEN, | No. 51357-9-II |
| Respondent, | |
| v. | |
| ROBERT K. McCORMIC, JR., a married man as his separate estate, as to defenses to Plaintiff's complaint to quiet title and First Counterclaim (Quiet Title), | UNPUBLISHED OPINION |
| Appellant, | |
| And | |
| WILLIAM OMAITS, a single man, as the successor in interest to ROBERT K. McCORMIC, JR., as to Counterclaims 2, 3 and 4 (Trespass, Ejectment and Waste or Injury to Land, | |
| Counterclaim Defendant. | |

GLASGOW, J. — Robert McCormic owned two residential lots of waterfront property. Adjacent to McCormic's two lots was another piece of land called the Portway. McCormic adversely possessed and then obtained title to the north half of the Portway, adding to his property waterfront footage that was equal to each of his other two lots.

McCormic obtained a loan, borrowing against his original two residential lots. While the lender was aware of McCormic's claim of ownership of the north half of the Portway, the lender's deed of trust did not describe the additional Portway property in its legal description of the property encumbered by the loan. Some years later, McCormic received and recorded a quitclaim deed that conveyed to him title to the north half of the Portway. McCormic eventually

defaulted on his loan, and a trustee instituted a nonjudicial foreclosure against the original two residential lots. Adrien Petersen bought the two residential lots at the trustee's sale.

A dispute then arose about whether the north half of the Portway should have been included in the trustee's deed that conveyed to Petersen the residential lots. The trustee's deed did not include or otherwise describe the adjacent Portway land in the legal description. The trial court granted summary judgment and quieted title in Petersen's favor. McCormic appeals.

McCormic contends that a trustee can convey title only to property described in a deed of trust and, therefore, title to the north half of the Portway was not conveyed to Petersen. Petersen argues that we should apply the after-acquired property doctrine to reform his deed to include the north half of the Portway. Alternatively, Petersen argues that the omission of the north half of the Portway was a scrivener's error, that a mutual mistake supports reformation of the deed, or judicial estoppel precludes McCormic from claiming ownership of the disputed land.

We agree with McCormic that the trustee conveyed to Petersen only the land described in the deed of trust, and none of Petersen's arguments warrant reformation of the deed. We therefore reverse and remand for the trial court to enter summary judgment in McCormic's favor. Although McCormic also asks that we quiet title in his favor, we leave that request for the trial court to resolve on remand.

FACTS

In 1974, McCormic bought a residential property consisting of two lots—Lot 1 and Lot 2—in the Port Madison community of Bainbridge Island. Adjacent to Lots 1 and 2 was another piece of land called the Portway. The Portway was a 100 foot wide parcel of platted real property on the south shore of Port Madison Bay. Historically, the Portway was an avenue likely

2

used for public access to the bay. For many years, McCormic landscaped, mowed, and maintained the north half of the Portway.

In 1994, McCormic planted three pine trees on the northern 50 feet of the Portway. In addition, McCormic obtained a commitment for title insurance that documented McCormic's purported fee ownership of the north 50 feet of the Portway and included a legal description of the property. Lots 1 and 2 totaled 100 frontage feet of waterfront, and the north half of the Portway totaled an additional 50 frontage feet of waterfront. So, the north half of the Portway amounted to about equal water frontage as each of the other two lots.

In 1995, the City of Bainbridge Island commissioned a survey of the Portway that was recorded with the Kitsap County Auditor in August 1996. The survey notes that McCormic's title insurance policy "vests ownership to adjoiners [the McCormics]." Clerk's Papers (CP) at 630.

In 2004, McCormic sued his uphill neighbors for timber trespass, outrage, and intentional infliction of emotional distress, alleging that they entered his part of the Portway and cut down the three pine trees he had planted in 1994. The complaint alleged that the "McCormics are the legal owners of . . . [t]he north 50 feet of a 100 foot waterfront Lot known as Portway which Lot is located immediately to the south of their home." CP at 320. The complaint also alleged that "[t]he Port Madison Company is the legal owner of the South 50 feet of the Portway." CP at 320.

In a declaration filed in the timber trespass case, the President of the Port Madison Water Company, a homeowners association for the Port Madison community, stated that the Port Madison community was the legal owner of the south 50 feet of the Portway, and the Port

3

Madison Company did not dispute McCormic's claim that he owned the north half of the Portway. The jury in that case returned a verdict in McCormic's favor.

Later that year, McCormic looked into obtaining a loan from Quality Express Mortgage, which then commissioned an appraisal of his property. This appraisal noted that "[t]he subject enjoys 150 F[rontage] F[eet] of medium to low bank waterfront located in the prestigious neighborhood of Port Madison." CP at 416. The appraiser combined McCormic's portion of the Portway with Lots 1 and 2 when valuing his property at $2.4 million.

McCormic also looked into obtaining a loan from another lender, MortgageIT, which also commissioned an appraisal of his property. That appraisal valued McCormic's property at $1.9 million. The appraiser similarly noted that "[p]er Land Title Company of Kitsap County, the subject site also includes an additional .06 acre and 50 frontage feet of the adjoining vacated street. The appraisal has been written to include this additional area." CP at 444.

In 2006, McCormic borrowed $1.33 million from MortgageIT, which it secured with a deed of trust against his property. The deed of trust included Lots 1 and 2 in its legal description of the property, but it did not include or describe any portion of the Portway.

In 2013, William Omaits, obtained two judgments against McCormic. As part of the associated collection action, Omaits obtained a copy of a 1994 insurance policy McCormic obtained for the Portway.

In 2014, McCormic visited the Kitsap County Assessor's Office to inquire why the county had not taxed him separately for his ownership of the north half of the Portway. He provided the assessor with a copy of his 1994 title insurance policy. Based on that policy, the assessor added the description of the 50 foot strip of property to the tax description of the

adjoining property. Later that year, Port Madison Water Company executed a quitclaim deed, for the sole purpose of clearing title, which conveyed to McCormic, as his separate property, title to the north 50 feet of the Portway. In return, McCormic executed a quitclaim deed that conveyed to Port Madison Water Company title to the south 50 feet of the Portway.

In 2015, McCormic filed a declaration inventorying his real property as a part of the Omaits collection action. In his declaration, McCormic listed his properties with their assessed values and encumbrances, including Lots 1 and 2, but he omitted any reference to his ownership of the north half of the Portway. Later that year, the court ordered McCormic to appear at a deposition and provide testimony, records, and documents concerning his assets. When asked under oath whether he had provided all the required records and documents, McCormic answered: "Yes." CP at 361, 374, 576. However, McCormic did not produce the 2014 quitclaim deed or any other documents related to his ownership of the north half of the Portway. Omaits also asked McCormic: "Other than the two rental properties and your personal residence, do you own any other real property?" CP at 578. McCormic answered: "No." CP at 578.

In 2016, the trustee for McCormic's loan with MorgageIT provided him with a written notice of default and then notice of nonjudicial foreclosure. It also published a notice of trustee's sale in the newspaper. The notice included Lots 1 and 2 in its legal description, but it did not include or describe any part of the Portway. The trustee sold the property at auction to Petersen for $1.051 million.

The trustee's deed granted and conveyed title to Petersen "without representations or warranties of any kind, expressed or implied." CP at 99. Petersen "acknowledge[d] and agree[d]

5

that the Property was purchased in the context of a foreclosure, that the current Trustee made no representations to" him "concerning the Property and that the current Trustee owed no duty to make disclosures . . . concerning the Property." CP at 99. Peterson also "acknowledge[d] and agree[d]" he relied solely upon his own due diligence investigation before electing to bid for the property. CP at 99.

The trustee's deed upon sale again included Lots 1 and 2 in its legal description, but, in accord with the deed of trust and the notice of trustee's sale, it did not include or describe any part of the Portway.

In February 2017, the Kitsap County Treasurer levied a new property tax on the north half of the Portway separate from the tax assessed on Lots 1 and 2. Because the trustee's deed upon sale did not include the Portway in the legal description, the assessor created a parcel number for the Portway separate from the one for Lots 1 and 2.

In March, McCormic proposed to Petersen a rental agreement for Petersen's use of McCormic's portion of the Portway to facilitate remodeling on Lots 1 and 2. Over the next several days, McCormic also put orange tape between the Portway and Lots 1 and 2, spray painted the boundary line between the properties, placed construction material on the ground at the boundary line, removed sections of fencing that formerly stood on the Portway, turned off the water main serving Lots 1 and 2, and padlocked the water main in the meter box, which is on the north half of the Portway.

In April, Petersen sent an e-mail requesting that the trustee, Quality Loan Corporation of Washington, reform its trustee's deed to add the legal description of the north half of the Portway

because "[t]he trustee's deed failed to include it."  CP at 270.  The trustee declined.  General

counsel for the trustee explained:

> In my experience *if* [*the trustee*] *had intended to foreclose upon or did foreclose upon any after-acquired real property, it would have specifically included the legal description of that after-acquired property in the Notice of Trustee's Sale and corresponding Trustee's Deed Upon Sale.*  In my experience and practice, [the trustee] can only convey the real property legally described in the Trustee's notice of trustee's sale, barring a court order or decree that includes additional property prior to the foreclosure proceedings.

CP at 224 (emphasis added).

Petersen filed a complaint to quiet title of the north half of the Portway and for

declaratory and injunctive relief.  The parties filed cross motions for summary judgment.

Petersen argued that the trustee's deed conveyed the north half of the Portway to him as after-

acquired property, the trial court should reform the trustee's deed based on mutual mistake or

scrivener's error, and judicial estoppel should preclude McCormic from taking inconsistent

positions concerning his ownership of the north half of the Portway.  McCormic argued that

conveyance of after-acquired property relates solely to property actually described in a deed of

trust, and Petersen's allegations of scrivener's error, mutual mistake, and judicial estoppel were

unsubstantiated.

The trial court granted Petersen's motion for summary judgment and denied McCormic's

motion.  The trial court entered a judgment and order quieting title in favor of Petersen, giving

him full and exclusive ownership and right of possession to the north half of the Portway.  The

judgment extinguished any claim of right, title, estate, lien, or interest McCormic had in the

Portway.

McCormic appeals.

ANALYSIS

We review an order granting summary judgment de novo. *Jackowski v. Borchelt*, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012). We "will consider only the evidence and issues called to the attention of the trial court." RAP 9.12; *see also Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013). Summary judgment is appropriate only if the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe the facts and draw all inferences in the light most favorable to the nonmoving party. *Kofmehl*, 177 Wn.2d at 594. If the undisputed facts on the record prove that the party against whom summary judgment was entered is actually entitled to summary judgment, we can order entry of summary judgment in that party's favor. *See Impecoven v. Dep't of Revenue*, 120 Wn.2d 357, 365, 841 P.2d 752 (1992).

A. Deeds of Trust and the Statute of Frauds

McCormic argues that a trustee can only sell and convey title to the property that is described in the deed of trust. We agree.

"A deed of trust is a form of a mortgage, an age-old mechanism for securing a loan." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013). In Washington, deeds of trust are governed by chapter 61.24 RCW. A deed of trust involves three parties. *Id*. at 782-83. The borrower conveys land to a trustee who holds title in trust for a lender as security for credit or a loan to the borrower. *Id*. at 782-83. "If the deed of trust contains the power of sale, the trustee may usually foreclose the deed of trust and sell the property without judicial supervision," i.e., a nonjudicial foreclosure. *Id.* at 783.

RCW 61.24.050(1) provides that "the trustee's deed shall convey all of the right, title, and interest in the real and personal property sold at the trustee's sale, which the grantor had or had the power to convey at the time of the execution of the deed of trust, and such as the grantor may have thereafter acquired." "'The trustee sells the title he receives. It is not his duty to guarantee the title in any way or to assure anyone that it is good and marketable. Even if that title be defective, the trustee must still on proper demand proceed to sell such title as he took.'" *McPherson v. Purdue*, 21 Wn. App. 450, 452, 585 P.2d 830 (1978) (quoting *Brown v. Busch*, 152 Cal.App.2d 200, 313 P.2d 19, 21 (1957)); *see also Mann v. Household Fin. Corp. III*, 109 Wn. App. 387, 392, 35 P.3d 1186 (2001) (likewise noting that "the trustee sells only the title he or she receives"). Moreover, "[t]he trustee for a deed of trust is not empowered to change the legal description of the deed." *Wash. Fed. v. Azure Chelan LLC*, 195 Wn. App. 644, 660, 382 P.3d 20 (2016).

The statute of frauds requires "[e]very conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed." RCW 64.04.010; *Key Design Inc. v. Moser*, 138 Wn.2d 875, 881, 983 P.2d 653 (1999), *as amended*, 993 P.2d 900 (1999). A "conveyance" for purposes of the statute includes "every written instrument by which any estate or interest in real property is created, transferred, mortgaged or assigned or by which the title to any real property may be affected." RCW 65.08.060(3). Accordingly, "[d]eeds of trust and trustee's deeds are subject to the statute of frauds." *Glepco, LLC v. Reinstra*, 175 Wn. App. 545, 554, 307 P.3d 744 (2013).

In *Martin v. Seigel*, 35 Wn.2d 223, 229, 212 P.2d 107 (1949), our Supreme Court held "that every contract or agreement involving a sale or conveyance of platted real property must

9

contain, in addition to the other requirements of the statute of frauds, the description of such property by the correct lot number(s), block number, addition, city, county and state." While *Martin* discussed a contract, rather than a conveyance, the court explained why strict application of the statute of frauds is important. *Id.* at 228. "We do not apologize for the rule. We feel that it is fair and just to require people dealing with real estate to properly and adequately describe it, so that courts may not be compelled to resort to extrinsic evidence in order to find out what was in the minds of the contracting parties." *Id.* And our Supreme Court has declined to depart from this rule when asked to do so. *Key Design*, 138 Wn.2d at 884.

In this case, McCormic obtained a loan, which the lender secured with a deed of trust against Lots 1 and 2. The deed of trust did not include or describe any part of the Portway in its legal description. After McCormic defaulted on the loan, the trustee published a notice of trustee's sale in the newspaper. The notice included Lots 1 and 2 in its legal description, but did not include or describe any portion of the Portway. The trustee sold the property at auction to Peterson. The trustee's deed included Lots 1 and 2 in its legal description, but, in accord with the deed of trust and notice of trustee's sale, the trustee's deed did not include or describe any part of the Portway.

Because the trustee can sell only the title they receive, *McPherson*, 21 Wn. App. at 452, *Mann*, 109 Wn. App. at 392, and because the trustee has no power to change the legal description of the trustee's deed, *Washington Federal*, 195 Wn. App. at 660, we hold the trustee in this case could sell only Lots 1 and 2, as described in the deed of trust and conveyed to Petersen via the trustee's deed. The trustee could not convey land that was not described in the trustee's deed. *See Martin*, 35 Wn.2d at 228.

10

B.      After-Acquired Title and Related Theories

1. After-Acquired Title

Petersen argues that the after-acquired title doctrine applies here to vest title to the north half of the Portway in him as the buyer of the adjacent property. McCormic argues that the term "after-acquired property," as used in RCW 61.24.050(1), applies only to property actually described in the deed. Br. of Resp't at 14-18; Reply Br. of Resp't at 2-7. We agree with McCormic.

RCW 61.24.050(1) provides: "[T]he trustee's deed shall convey all of the right, title, and interest in the real . . . property sold at the trustee's sale which the grantor had or had the power to convey at the time of the execution of the deed of trust, and such as the grantor may have *thereafter acquired*." (Emphasis added.) But the statute does not define what constitutes property *thereafter acquired*.

We review questions of statutory interpretation de novo. *Udall v. T.D. Escrow Servs., Inc.*, 159 Wn.2d 903, 908, 154 P.3d 882 (2007). Our objective in interpreting a statute is to determine the legislature's intent. *Id*. at 909. "'[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.'" *Id*. (quoting *Tingey v. Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007)). "Plain meaning is 'discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Id.* (quoting *Tingey*, 159 Wn.2d 657). "Reference to a statute's context to determine its plain meaning also includes examining closely related statutes, because legislators enact legislation in light of existing statutes." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 11, 43 P.3d 4

11

(2002) (quoting 2A Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed. 2000)). And statutes that relate to the same subject matter should be read together. *Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001). "[T]he deed of trust act 'must be construed in favor of borrowers because of the relative ease with which lenders can forfeit borrowers' interests and the lack of judicial oversight in conducting nonjudicial foreclosure sales.'" *Klem*, 176 Wn.2d at 789 (quoting *Udall*, 159 Wn.2d at 915-16).

RCW 64.04.070, a related statute albeit in a different title, clarifies that an after-acquired title follows the deed. It states that "[w]henever any person . . . convey[s] by deed any lands . . . and who, at the time of such conveyance, had no title to such land," but later "acquire[s] a title to such lands so sold and conveyed, such title shall inure to the benefit of the purchasers or conveyee . . . of such lands to whom such deed was executed and delivered." In addition, our Supreme Court has applied the doctrine where the property at issue was actually described in the deed. *See, e.g.*, *Gough v. Center*, 57 Wash. 276, 277, 106 P. 774 (1910) (after-acquired property at issue actually described in deed); *Davis v. Starkenburg*, 5 Wn.2d 273, 279-80, 105 P.2d 54 (1940) (same).

The *Washington Real Property Deskbook*, § 32.7(7) (3d ed. 1997), also explains that "after-acquired title concerns the vesting of title to property *actually described in a deed*, but which the grantor did not own at the time of conveyance." (Emphasis added.) The doctrine is "based on the premise that a grantor should not be allowed to dispute to warranties of ownership given in the deed." *Id.* *Black's Law Dictionary* at 72 (10th ed. 2014), echoes this concept and defines the after-acquired-title doctrine as: "The principle that title to property automatically

vests in a person who bought the property from a seller who acquired title only after purporting to sell the property to the buyer."

Petersen relies on additional language in the *Deskbook* for his contrary interpretation of the doctrine. He contends that broad language in the *Deskbook* explains that an after-acquired title "includes any title or interest later acquired by the grantor, irrespective of how or when acquired." *Wash. Real Property Deskbook* § 32.7. "This includes not only rights or expectancies that existed at the time the deed was given, and later matured, but also any title subsequently acquired by the grantor, even if acquired through an independent purchase transaction." *Id*. However, this language must be read in context with the *Deskbook*'s prior statement that after-acquired property includes only property described in the deed. *Id.*

Petersen also relies on *Stevens v. Stevens*, 10 Wn. App. 493, 495-97, 519 P.2d 269 (1974), to support his understanding of the doctrine. *Stevens* is distinguishable because, in that case, the quitclaim deed expressly applied to the grantor's after-acquired interest in property that was described in the deed. *Id.* at 494. Here, the deed of trust and trustee's deed described only Lots 1 and 2 and did not describe any portion of the Portway.

McCormic did not purport to encumber the north half of the Portway in his deed of trust with MortgageIT, as it did not include any portion of the Portway in the legal description of the property securing the loan. There is no evidence on the record that MortgageIT had bargained for any right, interest, or expectancy in any part of the Portway that existed at the time McCormic executed the deed of trust. MortgageIT thus had no rights, interests, or expectancies in the Portway that later matured to its benefit. Moreover, the trustee also appears to have viewed the deed of trust and trustee's deed as reflecting the lender's intent not to include the

north half of the Portway in either the deed of trust or trustee's deed. General counsel for the trustee explained: "In my experience if [the trustee] had intended to foreclose upon or did foreclose upon any after-acquired real property, it would have specifically included the legal description of that after-acquired property in the Notice of Trustee's Sale and corresponding Trustee's Deed Upon Sale." CP at 224.

Thus, we hold that the reference to after-acquired property in RCW 61.24.050(1) did not incorporate into the trustee's deed the north half of the Portway because that property was not specifically described in the deed.

2. Appurtenance

Petersen also argues that land "may become appurtenant to land . . . by the acts and intentions of the parties." Br. of Resp't at 18. We disagree.

Petersen relies again on the *Deskbook*, which provides that "[a]n appurtenance is an incidental or accessory right or benefit that belongs to the land that it benefits. . . . [A]s a general rule, land is not appurtenant to other land, and so title to land not described in the deed will not pass as an appurtenance." *Wash. Real Property Deskbook* § 32.7(6). That said, the *Deskbook* at section 32.7(6), recognizes that in some cases, "[l]and may become appurtenant to land" only "if all the facts and circumstances show that it was the grantor's intent to convey it."

But Washington courts have not necessarily agreed, and some cases hold that land cannot, even rarely, become appurtenant to land. *See, e.g.*, *Butler v. Craft Eng'g Constr. Co.*, 67 Wn. App. 684, 697, 843 P.2d 1071 (1992) ("land cannot be appurtenant to land"); *Hurley v. Liberty Lake Co.*, 112 Wash. 207, 211, 192 P. 4 (1920) ("real property cannot be appurtenant to real property"); *Brown v. Carkeek*, 14 Wash. 443, 447-48, 44 P. 887 (1896) ("It is true that, in a

strict legal sense, land cannot be appurtenant to land."). Moreover, McCormic expressly disavowed any intent to encumber the north half of the Portway via the deed of trust. Thus, title to the Portway, which was not described in the deed of trust or trustee's deed, could not pass as an appurtenance.

### 3. Tacking of Adverse Possession

Finally, Petersen analogizes this case to *El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 854-57, 376 P.2d 528 (1962), arguing that the adversely possessed north half of the Portway became indivisible from McCormic's other lots through the theory of tacking. But tacking involves accumulation of *time* for purposes of determining whether a piece of property was adversely possessed. "This state follows the rule that a purchaser may tack the adverse use of its predecessor in interest to that of his own where the land was intended to be included in the deed between them, but was mistakenly omitted from the description." *Id*. at 856.

*El Cerrito* is distinguishable. In that case, successive landowners both adversely possessed an adjacent two and a half foot strip of property. *Id*. at 854-55. The court held that "the failure to include the disputed strip in the deed did not prevent the subsequent purchaser from acquiring title by adverse possession." *Id*.

Here, Petersen cannot show that McCormic or his lender intended the north half of the Portway to be included in the deed of trust or the trustee's deed. And tacking periods of adverse possession does not apply here in light of the intervening quitclaim deed that precisely described the north half of the Portway and was recorded for the purpose of clearing title. Nor is it appropriate to use tacking to overcome McCormic's intent where the land at issue here is not merely an adjacent strip, but the size of an entire lot. McCormic's tacking argument fails.

15

C.      Mutual Mistake and/or Scrivener's Error

Petersen argues a mutual mistake or scrivener's error produced the incomplete legal description in the deed of trust, which unintentionally excluded the north half of the Portway. We disagree.

A trial court has equitable power to reform a writing that is materially contrary to the parties' intent. *See Denaxas v. Sandstone Court of Bellevue, L.L.C.*, 148 Wn.2d 654, 669, 63 P.3d 125 (2003); *Glepco*, 175 Wn. App. at 560. A mutual mistake arises if the parties had the same intentions, but their written agreement does not accurately express their intentions. *Glepco*, 175 Wn. App. at 561. A mistake is a belief that is not in accord with the facts, held at the time the contract is made, that relates to a basic assumption held by both parties, and that has a material effect on the agreement. *Denaxas*, 148 Wn.2d at 668.

A party may invoke mutual mistake only if the party did not bear the risk of mistake. *Id.* "[A] party bears the risk of mistake when, at the time the contract is made, the party is aware of limited knowledge with respect to the facts to which the mistake relates but treats such limited knowledge as sufficient." *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 362, 705 P.2d 1195 (1985), *modified*, 713 P.2d 1109 (Wash. 1986). "A party with constructive knowledge of the circumstances giving rise to the alleged mistake does not hold a belief not in accord with the facts." *Denaxas*, 148 Wn.2d at 668.

A scrivener's error arises when the intention of the parties is identical at the time the contract was executed, but the written agreement errs in expressing that intention. *Glepco*, 175 Wn. App. at 561. A court determines the parties' intent "'by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the

contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" *Glepco*, 175 Wn. App. at 561 (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990)).

The general rule is that an incomplete legal description is not subject to reformation. *Key Design*, 138 Wn.2d at 888. An exception is when mutual mistake or scrivener's error caused the incomplete legal description. *Id*. A trial court may reform a conveyance of real property on the ground of mutual mistake only where such mistake is proven by clear, cogent, and convincing evidence. *Id*. The evidence must show that the parties had an identical intent at the time of the transaction and that the written agreement did not express that intent. *Id*.

Petersen argues MortgageIT and McCormic shared an intent to include the north half of the Portway in the deed of trust's legal description of the property and, therefore, the north half of the Portway should have been included in the trustee's deed upon sale. Petersen asks us to rewrite the deed of trust and the trustee's deed, but he fails to establish that a mutual mistake or scrivener's error occurred.

The undisputed evidence establishes that MortgageIT and McCormic, in executing the 2006 deed of trust, intended to secure the loan with only Lots 1 and 2. MortgageIT commissioned an appraisal of McCormic's property. The appraiser noted: "Per Land Title Company of Kitsap County, the subject site also includes an additional .06 acre and 50 frontage feet of the adjoining vacated street. The appraisal has been written to include this additional area." CP at 444. That appraisal valued McCormic's property, including Lots 1 and 2, and the north half of the Portway, at $1.9 million. McCormic borrowed $1.33 million from MortgageIT, which the lender secured with a deed of trust against only Lots 1 and 2.

17

McCormic declares he never intended to encumber the north half of the Portway when he sought the loan. There is no evidence in the record of MortgageIT's intent outside of the four corners of the writing. The deed of trust's legal description of the property securing the loan did not include or describe any part of the Portway. General counsel for the trustee also confirmed its interpretation of both the deed of trust and the trustee's deed, which he understood evidenced an intent not to include the Portway. Significantly, the appraised value of the two lots covered the amount of the loan without the value of the north half of the Portway. The only reasonable inference based on these facts is that MortgageIT knew McCormic owned the north half of the Portway, but it did not require that land as security for McCormic's loan.

Furthermore, the appraisal provided MortgageIT with actual and constructive knowledge of McCormic's claim to the north half of the Portway when it contracted with McCormic; thus, MortgageIT bore the risk of any mistake in not securing its loan properly. *See Denaxas*, 148 Wn.2d at 668; *Pub. Util. Dist. No. 1*, 104 Wn.2d at 362. Petersen cannot show by clear, cogent, and convincing evidence that MortgageIT and McCormic shared an identical intent to include the north half of the Portway as security for the loan. We cannot rewrite the deed of trust to force a bargain that the parties never made. *See Denaxas*, 148 Wn.2d at 670.

Petersen has presented no evidence to establish the existence of either mutual mistake or scrivener's error. *See id*. Thus, we hold reformation is an improper remedy in this case.

D.    Judicial Estoppel

Petersen next argues that judicial estoppel bars McCormic from claiming ownership of the north half of the Portway. We decline to apply judicial estoppel here.

"'Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *In re the Committed Intimate Relationship of Amburgey & Volk*, No. 49389-6-II, slip op. at *3, 2019 WL 1997678 (Wash. Ct. App. May 7, 2019) (quoting *Chonah v. Coastal Vill. Pollock, LLC*, 5 Wn. App. 2d 139, 147, 425 P.3d 895 (2018), *review denied* 192 Wn.2d 1012 (2019)). The doctrine seeks to preserve respect for judicial proceedings, and to prevent inconsistency, duplicity, and waste of time. *Id.* (citing *Chonah*, 5 Wn. App. 2d at 147). The doctrine is not designed to protect litigants. *Id.*

Generally, we review a trial court's decision to apply the equitable doctrine of judicial estoppel for abuse of discretion. *Id.* But on summary judgment there are no findings of fact, so our review is de novo. *See id*.

First, while Petersen argues that judicial estoppel requires the court to deem the north half of the Portway property his, despite its omission from the deed conveying the property to him, it is not clear that judicial estoppel is a viable exception to the strict application of the statute of frauds. In *Key Design*, our Supreme Court rejected a similar doctrine, deciding instead that the statute of frauds strictly applied. *See* 138 Wn.2d at 884. The court explained that "in the statute of frauds context, the judicial admissions doctrine allows courts to enforce oral agreements involving title to real estate as long as the party against whom enforcement is sought has admitted in court or during discovery that an oral agreement existed." *Id.* But the court firmly declined to adopt the judicial admissions exception to the statute of frauds. *Id*. at 888. Moreover, "[t]itle to real property is a most valuable right and will not be disturbed by estoppel unless the evidence is clear and convincing." *Mugaas v. Smith*, 33 Wn.2d 429, 434, 206 P.2d

19

332 (1949); *Finley v. Finley*, 43 Wn.2d 755, 765-66, 264 P.2d 246 (1953); *see also King County v. Boeing Co.*, 62 Wn.2d 545, 551, 384 P.2d 122 (1963).

The strict application of the statute of frauds and the courts' reluctance to use estoppel to divest ownership of real property both raise serious doubt as to whether judicial estoppel is even available as an exception to the statute of frauds.

Even if it is, judicial estoppel does not support the transfer of the north half of the Portway from McCormic to Petersen. Whether to apply judicial estoppel is guided by three nonexclusive core factors:

> (1) whether a party's later position is clearly inconsistent with its earlier position;
> (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and
> (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538-39, 160 P.3d 13 (2007) (internal quotations marks omitted) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 753, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)). "The inconsistent positions 'must be diametrically opposed to one another.'" *Overlake Farms B.L.K. III, LLC v. Bellevue-Overlake Farm, LLC*, 196 Wn. App. 929, 936, 386 P.3d 1118 (2016) (quoting *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 581, 291 P.3d 906 (2012)). Further, "[a]pplication of the doctrine may be inappropriate 'when a party's prior position was based on inadvertence or mistake.'" *Id*. (quoting *New Hampshire*, 532 U.S. at 753).

Petersen has not established by clear and convincing evidence that McCormic took a diametrically opposite position in prior litigation. *See Arkison*, 160 Wn.2d at 538-39. In connection with the Omaits collection action, McCormic filed a declaration inventorying his real property that omitted any reference to the north half of the Portway. McCormic also did not

20

produce the 2014 quitclaim deed or any other documents establishing his ownership of the north half of the Portway in that case. Omaits also asked McCormic in a deposition: "Other than the two rental properties and your personal residence, do you own any other real property?" CP at 578. McCormic answered: "No." CP at 578.

But Omaits did have a copy of the 1994 insurance policy McCormic obtained for the north half of the Portway. Omaits also had copies of the two appraisals commissioned on McCormic's property by Quality Express Mortgage and MortgageIT, both of which included the north half of the Portway. Thus, Omaits had information that clearly showed McCormic owned or claimed ownership of the north half of the Portway. Thus, the evidence in the Omaits collection action about the north half of the Portway was at best, mixed.

In addition, McCormic has not presented evidence that McCormic misled *the trial court* in the Omaits collection action. *See Arkison*, 160 Wn.2d at 538-39. Petersen does not point to any evidence in the record that shows the trial court was even aware of McCormic's deposition testimony. The record does not provide clear and convincing evidence that McCormic misled the trial court.

Finally, McCormic's current assertion of ownership does not create an unfair advantage for him. *See Arkison*, 160 Wn.2d at 538-39; *In re Amburgey & Volk*, No. 49389-6-II, slip op. at *10-11. To the contrary, allowing McCormic to retain record title to the north half of the Portway will provide his creditors, like Omaits, with an asset to execute on. *See also Chonah*, 425 P.3d at 900-01. And the alleged harm that Omaits suffered—namely, his inability to execute on the north half of the Portway in a separate collection action—would not be remedied by vesting title in Petersen.

21

No. 51357-9-II

We conclude that the doctrine of judicial estoppel does not divest McCormic of ownership of the north half of the Portway.

CONCLUSION

For the reasons outlined above, we hold the trial court erred when it granted summary judgment in Petersen's favor. We reverse the order granting summary judgment to Petersen and denying summary judgment to McCormic. We remand for entry of summary judgment in McCormic's favor. *See Impecoven*, 120 Wn.2d at 365. Although McCormic also asks that we quiet title in his favor, we leave that request for the trial court to resolve on remand.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Melnick, P.J.

Sutton, J.

22